**UNITED STATES of America, Plaintiff,**

v.

**Kenneth D. GOOCH, Defendant.**

**No. CR–91–174–JLQ.**

United States District Court,
E.D. Washington.

Dec. 12, 1991.

---

Timothy J. Ohms, Asst. U.S. Atty., Spokane, Wash., for plaintiff.

Daniel J. Keane, Brian L. Meck, Spokane, Wash., for defendant.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

QUACKENBUSH, Chief Judge.

BEFORE THE COURT is Defendant's Motion to Suppress Evidence Based on Unlawful Arrest (Ct. Rec. 22), heard on December 4, 1991. Timothy J. Ohms represented the Plaintiff; Daniel J. Keane and Brian L. Meck represented the Defendant. Having reviewed the record, heard from

counsel, and being fully advised in this matter, this order is intended to memorialize the court's oral ruling in the hearing on this matter.

## I. FACTUAL BACKGROUND

The following portion of the facts has been stipulated to by the parties for the purpose of this proceeding. On July 7, 1991, at 4:52 a.m., the Stevens County Sheriff's Office was contacted by the Spokane County Sheriff's Office regarding an alleged assault at the residence of Defendant, Kenneth Gooch, located at 3265 Highway 231, East Valley, Stevens County, Washington. Stevens County Deputy Sheriff Paul Murray was advised of the incident at 4:55 a.m. The alleged victims, Hazel R. Sims, Gooch's sister, and Darryl S. Slater, Sims's companion, contacted the Spokane County Sheriff's Office claiming that Kenneth Gooch had assaulted them with a rifle and held them against their will at Gooch's residence. Ms. Sims alleged that Gooch had been drinking alcohol and ingesting Demerol and Tylenol 4 when he became violent, and began to beat her with his fists and kick her. He then allegedly produced a .22 caliber rifle and threatened to kill her. Somehow, Ms. Sims managed to phone a friend, Darryl Slater, for help. When Mr. Slater arrived at Gooch's residence, he was allegedly met at gunpoint by Gooch, after which he was prevented from leaving. Gooch eventually passed out around 5:00 a.m. It was at this time that Sims and Slater left the Gooch residence and traveled to Spokane County, where they called the Spokane County Sheriff's Department.

At 6:08 a.m., Mr. Slater contacted the Stevens County Sheriff's Office, advising that he and Ms. Sims were leaving the Deer Park area to return to their home in Spokane. According to the testimony of Stevens County Deputy Sheriff Ted Campbell, Ms. Sims's house was located approximately 30 miles away from Gooch's house. At approximately 7:00 a.m., Deputy Murray contacted Sergeant Craig Thayer, of the Stevens County Sheriff's Department, regarding the incident. Sergeant Thayer directed that Deputy Campbell make personal contact with Sims and Slater at their home in Spokane.

While Deputy Campbell was at the Sims residence in Spokane, Sergeant Thayer drove to the Stevens County Sheriff's Office in Colville. At approximately 8:00 a.m., Sergeant Thayer requested that Sheriff Richard C. Andres call out the Stevens County Sheriff's Tactical Response Team to take Gooch into custody. At 8:53 a.m., the Stevens County Tactical Response Team was activated.

At 9:30 a.m., Deputy Campbell arrived at the Sims home at North 2711 Regal, Spokane, and took Sims's and Slater's statements. According to the testimony of Deputy Campbell, he observed that Ms. Sims was injured, and advised her to see a doctor. Ms. Sims indicated to Deputy Campbell that Gooch had caused her injuries the prior evening, and at that time had threatened her life. At approximately 10:10 a.m., Ms. Sims received a telephone call from Mary Baker. Ms. Baker is Defendant Gooch's girlfriend, and was allegedly present during Sims's and Slater's captivity. Ms. Baker, calling from the Gooch residence, allegedly wanted to know whether or not Ms. Sims had called the police. According to the testimony of Deputy Campbell, he listened in on the phone conversation at Ms. Sims's request.

At 10:30 a.m., the Tactical Response Team met at the Chewelah Police Department. At 10:55, the team went to the Christian Church at the junction of Highway 232 and Highway 395, and then Sergeant Thayer and Stevens County Deputy Sheriff Colin Webb went on to an abandoned house approximately 100 yards north of the Gooch residence. From there, they could observe the northwest and east sides of the Gooch house. Sergeant Thayer then called for the rest of the team to move to the abandoned house. A plan was formulated whereby the remaining team members (approximately nine officers) would surround the Gooch residence, and Sergeant Thayer would contact Mr. Gooch by telephone and request that he come out of the home. Then, at 11:07 a.m., without an

arrest or search warrant, Detective Webb and other members of the Tactical Response Team approached the northwest side of the Gooch house.

As stated previously, the preceding portion of the facts are not in dispute; however, the events which transpired after 11:07 are disputed.

Sergeant Thayer testified that, at 11:27 a.m., he telephoned Gooch with a portable phone and told him that camouflaged deputies were outside his residence and to come out of the home with his hands in plain view. However, according to the testimony of Gooch, he was told during this call that his house was surrounded, that he was under arrest, and that if he did not surrender peaceably, the police would extricate him by force. Indeed, on cross-examination, Sergeant Thayer acknowledged that Gooch's house was, in fact, surrounded by camouflaged members of the Tactical Response Team, and that Gooch was not free to leave. According to Sergeant Thayer, it was his intent that all officers, vehicles and weapons remain hidden until after Gooch exited his residence. However, Gooch testified that after answering the call from Sergeant Thayer, he looked out his window and saw a Sheriff's patrol car down the hill from his house and a police officer wearing a camouflaged uniform hiding behind a car in his yard.

According to the testimony of Gooch, he complied with Sergeant Thayer's instructions to surrender peaceably. However, as soon as he exited his house, he was met by Detective Burns, who had his service weapon drawn and pointed at him. Gooch apparently became quite hostile because the Tactical Response Team all had their weapons drawn and pointed at him. At this point, according to Gooch, he told the officer to either point his gun toward the ground or use it. Subsequently, Detective Webb and Deputy Kevin Nave laid down their weapons and advanced on Mr. Gooch. According to Sergeant Thayer, Mr. Gooch was handcuffed at approximately 12:10 p.m. Thereafter, Deputy Paul Murray transported Gooch to the Stevens County Jail. The Deputy removed Gooch's hand-cuffs and told Gooch to empty his pockets. Mr. Gooch had two .22 caliber bullets in his left pants pocket, which are the subject of this suppression motion. The .22 caliber rifle apparently was never located.

The Indictment alleges two counts against the Defendant: Count 1—felon in possession of a firearm on or about July 29, 1990, to-wit, a .22 caliber revolver; and Count 2—felon in possession of ammunition on or about July 7, 1991, to-wit, two rounds of .22 caliber ammunition. Gooch seeks to suppress all evidence obtained as a result of his allegedly unlawful arrest on July 7, 1991, including the two rounds of .22 caliber ammunition found on his person, statements given by him to the police after his arrest, and statements made by occupants of his house after his arrest. However, because the Government has stipulated that it will not use, at trial, the statements made by individuals in Gooch's house after his arrest, the court will only determine whether the ammunition and Gooch's statements should be suppressed.

## II. DISCUSSION

"It is a basic principle of Fourth Amendment law that searches and seizures *inside a home* without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980) (emphasis added). This presumption is not only based on the intrusive nature inherent in all arrests, but also on the invasion of the sanctity of the home. *Id.* at 588–89, 100 S.Ct. at 1381. The Supreme Court has held that the invasion of the sanctity of the home is too substantial an invasion "to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present." *Id.* at 589, 100 S.Ct. at 1381 (*quoting United States v. Reed*, 572 F.2d 412, 423 (2d Cir. 1978), cert. denied *sub nom. Goldsmith v. United States*, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259). If exigent circumstances are alleged, the burden is on the Government to establish their existence. *Welsh v.*

*Wisconsin,* 466 U.S. 740, 750, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984).

■ Succinctly phrased, the Court in *Payton* interpreted the Fourth Amendment as requiring two things for the arrest of a suspect in his or her home: (1) probable cause to believe that a felony has been committed, and (2) an arrest warrant, the suspect's consent to enter the residence, or exigent circumstances. Furthermore, even if police possess an arrest warrant, they must also have probable cause to believe that the person named in the arrest warrant resides at the home searched. *United States v. Harper,* 928 F.2d 894, 896 (9th Cir.1991). If the police lack probable cause to believe that the suspect is an actual resident, but have probable cause to believe that he is present, they must also get a search warrant. *Id.*

In the case at bar, the court finds, based on the testimony of Sergeant Thayer·and Deputies Campbell and Murray, that probable cause existed for the arrest of Gooch on assault charges.[1] It is undisputed that the arrest of Gooch was accomplished without either a search or arrest warrant. Therefore, the remaining question is whether Gooch's arrest involved an invasion of his home and, if so, whether exigent circumstances existed which justified such an invasion.

### A. *Arrest in the Home*

■ Simply stated, the issue is whether Gooch was effectively arrested when he was instructed to exit his residence with his hands in plain view after the Tactical Response Team surrounded his home. Whether an arrest occurs

> depends on all of the surrounding circumstances, including the extent that freedom of movement is curtailed and the degree and type of force or authority used to effectuate the stop.... The question is whether, under all of the circumstances, a reasonable person would conclude he was under arrest.

*United States v. Patterson,* 648 F.2d 625, 632 (9th Cir.1981). Stated differently, an arrest is effectuated when circumstances "amount to a show of official authority such that a reasonable person would have believed he was not free to leave." *Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983).

■ Gooch cites three cases in support of his position;[2] however, these cases are non-binding authority and are not directly on point. For example, in *Holeman,* the police officers reached through an open doorway to arrest the suspect who was actually still inside his house. Further, in *Scroggins,* the police officers knocked on the door of the suspect's motel room, and when he answered, the officers drew their guns and ordered him outside, where they effectuated the arrest. Clearly, these two cases present facts quite different from those in the case at bar.

The third case cited by Gooch is the closest thing to a factually analogous case, but it too is distinguishable. In *Holloway,* a § 1983 civil rights case, the plaintiff alleged that his arrest was unconstitutional. There, the plaintiff was told by police, via telephone, to come out of his home, which he did. Although the plaintiff's house was surrounded and the roads coming into the area were blocked, it does not appear that the plaintiff was informed of this. The court, in denying a summary judgment motion, found genuine issues of material fact regarding whether the plaintiff placed himself voluntarily in a public place, and whether he willingly relinquished his expectation of privacy. *Holloway,* 751 F.Supp. at 865. Because of the nature of the case and its holding, the court's opinion in *Holloway* regarding the validity of the arrest can, at best, be considered *dictum.*

A case more directly on point, and one whose reasoning is binding on this court, is *United States v. Al–Azzawy,* 784 F.2d 890 (9th Cir.1985). There, police officers were summoned to a trailer park to investigate a

---

1. For the purpose of his Motion to Suppress, the Defendant did not contest the existence of probable cause.

2. *State v. Holeman,* 103 Wash.2d 426, 693 P.2d 89 (1985); *Elder v. Holloway,* 751 F.Supp. 858 (D.Idaho 1990); and *Scroggins v. State,* 276 Ark. 177, 633 S.W.2d 33 (1982).

disturbance. Upon arriving at the trailer park, the officers were informed that Al–Azzawy had made several threats of violence against various individuals, including threatening to shoot Steven Williams, to blow up the trailer park, and to burn Williams's trailer. The officers surrounded Al–Azzawy's trailer with their guns drawn and ordered him to come out. When Al–Azzawy appeared, he was ordered to get on his knees and place his hands on his head, which he did. He was then frisked and questioned.

Adopting the reasoning of the Sixth Circuit in *United States v. Morgan*, 743 F.2d 1158 (6th Cir.1984), the court in *Al–Azzawy* held that Al–Azzawy was effectively arrested in his home for purposes of the Fourth Amendment. Specifically, the court held:

> [Al–Azzawy] was not free to leave, his freedom of movement was totally restricted, and the officer's show of force and authority was overwhelming. Any reasonable person would have believed he was under arrest in these circumstances. Moreover, since [Al–Azzawy] was in his trailer at the time he was surrounded by armed officers, and since he did not voluntarily expose himself to their view or control outside his trailer but only emerged under circumstances of extreme coercion, the arrest occurred while he was still inside his trailer.

*Al–Azzawy*, 784 F.2d at 893.

In the case at bar, the Government contends that the officers of the Tactical Response Team were hidden from view, despite Gooch's testimony to the contrary. It appears that the Government is using this point in an attempt to distinguish *Al–Azzawy* from the instant case. However, the court finds Gooch's testimony credible, and therefore concludes that he did observe police activity outside his house. In fact, Gooch's testimony is not really in conflict with Sergeant Thayer's testimony, for Sergeant Thayer merely testified that it was his *intent* that his officers remain hidden, not that they actually were. Nevertheless, this finding is not a prerequisite to the application of the *Al–Azzawy* rationale in

this case. Regardless of whether or not Gooch could see the Tactical Response Team, the court finds that he was told, either directly or indirectly, that he was surrounded. The fact that Gooch knew he was surrounded by armed officers is critical here, not the fact that the officers were or were not in plain view.

Even if Sergeant Thayer did not directly tell Gooch over the phone that he was under arrest, the implication contained in his statements was clear: Gooch was not free to leave, he was under arrest. Like Al–Azzawy, Gooch's movement was completely restricted, and a person in Gooch's position, upon being informed that his house was surrounded by the police, would have reasonably believed that he was under arrest. Furthermore, Gooch did not consent to leave his home voluntarily. Rather, he exited his home only after being told by the police that he was surrounded and to come out with his hands in plain view.

For the reasons stated, the court finds that the Tactical Response Team constructively entered Gooch's home by surrounding it and ordering Gooch outside. Furthermore, because a reasonable person in Gooch's position would have not felt free to leave, the constructive entry constituted an arrest inside Gooch's home. *See Al–Azzawy*, 784 F.2d at 893.

The Government contends that applying the *Payton* rule to the facts here would expand *Payton* far beyond its original application. The court disagrees. By holding that Gooch was effectively arrested inside his home, the court honors the intent underlying the *Payton* rule. To allow law enforcement officials to surround a home and order a suspect out without a warrant would simply provide a procedure whereby the safeguards inherent in the *Payton* rule could be unilaterally avoided by law enforcement personnel.

Because it is undisputed that the police officers did not have an arrest warrant, Gooch's arrest can only be constitutional if exigent circumstances existed, thus justifying the warrantless home arrest.

## B. *Exigent Circumstances*

 The Ninth Circuit has defined exigent circumstances as "those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay a search [or arrest] until a warrant could be obtained." *United States v. Salvador*, 740 F.2d 752, 758 (9th Cir.1984). Examples of exigent circumstances include:

> those circumstances that would cause a reasonable person to believe that entry ... was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.

*United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir.1984) (en banc). The critical time for determining whether exigency exists "is the moment of the warrantless entry by the officers onto the premises of the defendant." *United States v. Morgan*, 743 F.2d 1158, 1162 (6th Cir.1984). Furthermore, the burden is on the Government to show that exigent circumstances existed which made the warrantless arrest imperative. *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S.Ct. 1969, 1971, 26 L.Ed.2d 409 (1970).

The Government claims that the Tactical Response Team's actions in this case were tailored to minimize the risks to the officers involved and the intrusion to Gooch. The Government appears to assert that exigent circumstances existed based on the seriousness of the offense and the fact that the threats of harm allegedly made by Gooch were ongoing. Further, the Government claims that there was reason to believe that Gooch would attempt to hide or secret evidence of the assault.

In support of its position that exigent circumstances existed, the Government cites *United States v. Davis*, 785 F.2d 610 (8th Cir.1986). In *Davis*, a rape case, the court found exigent circumstances based on the existence of the following factors: (1) the suspect was accused of a serious crime, rape; (2) he had allegedly threatened the victim by stating that he had a gun, so he was possibly armed; (3) the

evidence of probable cause was clear ...; (4) there was cause to believe that evidence would be destroyed ...; (5) the confrontation was peaceful and no intrusive force was used; and (6) the arrest was not made late at night, but rather at early evening and within a very short time after the alleged rape.

*Id.* at 615. The court finds that the Government's reliance on *Davis* is misplaced. Here, unlike in *Davis*, intrusive force was used. Further, once the Gooch residence was surrounded, there was no real possibility that evidence (the gun) could have been destroyed, in contrast to *Davis*, where the evidence (seminal fluid) could have been easily destroyed. Finally, the arrest in question did not occur within "a very short time" after the alleged assault. In fact, it occurred at least 6½ hours later. The court in *Davis* did not articulate the weight it afforded to each factor. Therefore, because at least three of the *Davis* factors are not present here, the case is distinguishable.

The court also concludes that the facts in the case at bar are distinguishable from those in *Al–Azzawy*, insofar as exigent circumstances are concerned. In *Al–Azzawy*, the police were summoned to deal with an ongoing threat of violence, while here there was no such ongoing threat. Further, in *Al–Azzawy*, the victim was present at the scene and the threats had just recently transpired. In the case *sub judice*, the assault, if any, took place many hours prior to the arrest. Specifically, the alleged victim, Ms. Sims, left the scene of the alleged assault some 6½ hours before the arrest and was 30 miles away when the arrest occurred. Finally, though in no way condoning any act of violence, the court notes that the violent threat in the case at bar involved a family dispute between siblings, while it did not in *Al–Azzawy*. In the court's view, this decreases, *somewhat*, the exigency involved.

The Government also cites several cases in support of its argument that the presence of a firearm alone gives rise to an

exigent circumstance.[3] The Supreme Court case cited by the Government, *Cady*, is clearly inapplicable to the circumstances before this court. In *Cady*, the Supreme Court was examining a search of a vehicle, not a home, and it is settled that there is a constitutional difference between houses and cars as far as the Fourth Amendment is concerned. *Cady*, 413 U.S. at 439, 93 S.Ct. at 2527. The other cases cited by the Government should be contrasted with *United States v. Killebrew*, 560 F.2d 729 (6th Cir.1977) which holds: absent a risk of escape or danger, warrantless entry into a suspect's motel room violates the Fourth Amendment, even though the police know that the suspect possesses a gun. *Id.* at 733–34. This principle was even more explicitly illustrated in *United States v. Morgan*, 743 F.2d 1158 (6th Cir.1984).

In *Morgan*, police obtained information that certain individuals were in the possession of illegal firearms, including automatic weapons. After obtaining this information, the police met at a local coffee shop to assess the situation and devise a plan of attack. After the meeting, and without a warrant, the police officers surrounded the suspect's home and ordered him out. After leaving the house, the suspect was handcuffed and formally arrested. The elapsed time between the receipt by the police of the information, and the subsequent arrest, was between 1 and 2 hours.

The court, after determining that none of the traditional exceptions justifying the abandonment of the warrant requirement were present, determined that there was no exigency present sufficient to justify the warrantless entry of the suspect's home, despite the fact that multiple firearms were suspected to be in the dwelling. *Id.* at 1162. The court concluded by stating that the arrest was a planned occurrence, rather than the result of an ongoing field investigation. *Id.* at 1163. Applying the *Morgan* rationale to the case at hand, this court comes to the same conclusion.

In order to establish exigency, the Government argues that the alleged threats of violence made by Gooch against Ms. Sims during her assault were ongoing. However, the court finds that the officers could not have reasonably felt that Gooch represented an immediate threat to Ms. Sims once they had his home surrounded, for Ms. Sims was some 30 miles away. Therefore, the court finds that any threat of harm made by Gooch to Ms. Sims during the alleged assault was not ongoing in the sense that Ms. Sims was in any immediate danger when the police arrived at Gooch's residence.

Likewise, the officers could not have reasonably felt that their safety, or the safety of the general public was in danger. *See United States v. Doe*, 764 F.2d 695, 698 (9th Cir.1985). Prior to the police contact, the Gooch residence appeared peaceful and calm, disruption occurred only after Gooch was confronted by the police at gunpoint. From their secured vantage points around the house, the police could not have reasonably felt an immediate threat of danger from Gooch. There is simply no evidence to indicate that the police would have placed themselves, Ms. Sims, or the general public in further danger if a warrant was obtained between 7:00 a.m. and 11:30 a.m., or once the Gooch house was surrounded. The only individuals who might have been in danger were the occupants of Gooch's home; however, the Government has not sustained its burden of establishing that these individuals were in any danger.

Furthermore, the court cannot find that immediate police action was required to prevent the destruction of evidence. The Government points to the fact that the .22 rifle was not found, apparently as an indication that an exigency actually existed at the time of arrest. First, the court notes that a substantial amount of time elapsed between the alleged assault and the officers' arrival at Gooch's residence (at least 6 hours). The court finds that during this time period Gooch would have had plenty of opportunity to dispose of the rifle or any

---

**3.** *Cady v. Dombrowski*, 413 U.S. 433, 448, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973); *United States v. Silva*, 745 F.2d 840, 847 (4th Cir.1984);

*Davis v. Robbs*, 794 F.2d 1129, 1130–31 (6th Cir.1986); *United States v. Queen*, 847 F.2d 346, 352–53 (7th Cir.1988).

other evidence of the alleged assault. Regardless, there was no independent indication at the time of the warrantless arrest that evidence was being destroyed, or about to be destroyed. At best, Gooch could have hoped to hide the gun inside his house; however, a complete search would surely have revealed the gun, had it been hidden while the police had Gooch's house surrounded.

In summary, the court finds that no exigent circumstance existed which justified the warrantless arrest of Gooch inside his home. The need to arrest Gooch on the spot was not such as to make it imperative to forego an arrest warrant. This finding is buttressed by the fact that approximately 6½ hours elapsed between the first report of the alleged assault, made by the victim after leaving Gooch's house, and Gooch's arrest. Further, the fact that almost 4 hours elapsed between Sergeant Thayer's decision to arrest Gooch—as indicated by his request that the Tactical Response Team be activated—and Gooch's arrest, evidences a lack of exigent circumstances. The court finds no evidence to show that an arrest warrant could not have been obtained by the police during the time it took to activate and place the Tactical Response Team. "Police officers may not, in their zeal to arrest an individual, ignore the fourth amendment's warrant requirement merely because it is inconvenient." *Morgan*, 743 F.2d at 1164. Succinctly phrased, the Government has failed to persuade the court that, at the time of the warrantless arrest, a substantial risk of harm to persons involved, or to the law enforcement process, would have arisen if the police had delayed the arrest until a warrant was obtained. *See Salvador*, 740 F.2d at 758. Therefore, because the court has determined that a warrantless arrest occurred inside Gooch's home, and no exigent circumstances existed, the arrest of Gooch was invalid.

### C. *Exclusionary Rule*

■ Under the exclusionary rule, all evidence or contraband discovered as a result of an illegal arrest is obtained in an illegal manner, and therefore must be suppressed.

*United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *Morgan*, 743 F.2d at 1167. In addition, an illegal arrest taints a subsequent consent to search. *See Florida v. Royer*, 460 U.S. 491, 507–08, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983) (illegal detention taints and invalidates consent to search).

Based on the exclusionary rule, the two .22 caliber bullets found in Gooch's pants pocket and his post-arrest statements given to the police must be suppressed.

IT IS HEREBY ORDERED:

1. The Defendant's Motion to Suppress Evidence Based on Unlawful Arrest (Ct. Rec. 22) IS GRANTED; the two .22 caliber bullets found in Gooch's pants pocket, and his post-arrest statements given to the police SHALL BE SUPPRESSED.

2. Based on the concession of the Government in light of this court's ruling in this matter, Count 2 of the Indictment SHALL BE DISMISSED. However, Count 1 against the Defendant shall proceed to trial as scheduled.

3. Pursuant to 18 U.S.C. § 3161(h)(1)(F), the period from November 20, 1991, when Defendant's motion was filed, until December 4, 1991, when it was resolved, is HEREBY DECLARED EXCLUDABLE for purposes of computing time under the Speedy Trial Act.

IT IS SO ORDERED.